```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
BOB LENNES,                              :
                                         :
                Plaintiff,               :   CASE NO.: _____
                                         :
    -against-                            :
                                         :
WESTERN GAS PARTNERS, LP,                :
BENJAMIN M. FINK, ROBIN H. FIELDER,      :
ROBERT G. GWIN, STEVEN D. ARNOLD,        :
DANIEL E. BROWN, MILTON CARROLL,         :
JAMES R. CRANE, DAVID J. TUDOR, AND      :
MITCHELL W. INGRAM,                      :
                                         :
                Defendants.              :
---------------------------------------- X
```

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Bob Lennes ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Western Gas Partners, LP ("WES" or the "Company") and the members of the Company's general partner's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with WES, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of WES by Western Gas Equity Partners, LP ("WGP") (the "Proposed Transaction").

2. On November 7, 2018, WES entered into a Contribution Agreement and Agreement

1

and Plan of Merger (the "Merger Agreement"), pursuant to which Clarity Merger Sub, LLC, a wholly owned subsidiary of WGP, will merge with and into WES, with WES as the surviving entity and a subsidiary of WGP.

3. Under the terms of the Merger Agreement, each share of WES common units will be converted into the right to receive 1.525 common units representing limited partner interests in WGP (the "Merger Consideration").

4. On January 28, 2019, in order to convince WES's public common unitholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Schedule 14A Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for WES; and (ii) the valuation analyses performed by the WES Special Committee's financial advisor, Lazard Frères & Co. LLC ("Lazard"), in support of its fairness opinion.

6. The special meeting of the Company's unitholders to vote on the Proposed Transaction is scheduled for February 27, 2019 (the "Unitholder Vote"). It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Unitholder Vote so Plaintiff can properly exercise his corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to WES's public common unitholders sufficiently in advance of the Unitholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, WES's common units trade on the Nasdaq stock exchange, which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of WES common units.

11. Defendant WES is a Delaware MLP managed by its general partner, Western Gas Holdings, LLC ("WES GP"), a Delaware limited liability company that is owned and controlled by

3

WGP.  WES's common units trade on the NYSE under the ticker symbol "WES."

12. Defendant Benjamin M. Fink is, and has been at all relevant times, a director of the Company.  Defendant Fink also currently serves as Chairman of the Board.

13. Defendant Robin H. Fielder is, and has been at all relevant times, a director of the Company.  Defendant Fielder is also the President and Chief Executive Officer of the Company.

14. Defendant Robert G. Gwin is, and has been at all relevant times, a director of the Company.

15. Defendant Steven D. Arnold is, and has been at all relevant times, a director of the Company.

16. Defendant Daniel E. Brown is, and has been at all relevant times, a director of the Company.

17. Defendant Milton Carroll is, and has been at all relevant times, a director of the Company.

18. Defendant James R. Crane is, and has been at all relevant times, a director of the Company.

19. Defendant David J. Tudor is, and has been at all relevant times, a director of the Company.

20. Defendant Mitchell W. Ingram is, and has been at all relevant times, a director of the Company.

21. The defendants identified in paragraphs 12 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with WES, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

22. WES is engaged in the business of gathering, compressing, treating, processing and

transporting natural gas; gathering, stabilizing and transporting condensate, natural gas liquids ("NGLs") and crude oil; and gathering and disposing of produced water.  In addition, in its capacity as a processor of natural gas, WES also buys and sells natural gas, NGLs and condensate on behalf of itself and as agent for its customers under certain of its contracts. WES provides these midstream services for APC, as well as for third-party producers and customers.

23. WGP was formed by Anadarko Petroleum Corporation ("APC") in September 2012 and its sole assets are the general partner interest in WES, as well as the IDRs and WES common units.  WGP is managed by its general partner, Western Gas Equity Holdings, LLC ("WGP GP"), a Delaware limited liability company that is owned and controlled by APC.

24. On November 7, 2018, the Board caused the Company to enter into the Merger Agreement.

25. Pursuant to the terms of the Merger Agreement, WES's unitholders will only receive 1.525 common units representing limited partner interests in WGP for each unit of WES they hold.

26. According to the November 8, 2018 press release announcing the Proposed Transaction:

**WESTERN GAS ANNOUNCES
SIMPLIFICATION TRANSACTION AND STRATEGIC
ACQUISITION**

**PROVIDES 2019 OUTLOOK**

**HOUSTON** – (PR NEWSWIRE) – November 8, 2018 – Western Gas Partners, LP (NYSE:WES) ("WES") and Western Gas Equity Partners, LP (NYSE:WGP) ("WGP" or the "Partnership") today announced they have entered into a merger agreement (the "Agreement") whereby WGP will acquire all the publicly held common units of WES and substantially all of the units owned by Anadarko Petroleum Corporation (NYSE: APC) ("APC") in a unit-for-unit, tax-free exchange (the "Simplification Transaction"). WES will survive as a partnership with no publicly traded equity and remain the borrower for all existing and future debt issuances, as well as the owner of all operating assets and equity investments. WGP will own 98% of WES, and APC will own the remaining 2%.

In conjunction with the Simplification Transaction, WES has agreed to acquire substantially all of APC's remaining midstream assets for a price of $4.015 billion (the "Acquisition," and together with the Simplification Transaction, the "Transactions"). The Transactions were negotiated and unanimously approved by the Special Committees of the Boards of Directors of the general partners of WGP and WES, and were also unanimously approved by the Boards of Directors of the general partners of WGP and WES, and the APC Board of Directors.

**Transaction Highlights**
- The WES incentive distribution rights ("IDRs") and general partner units will be eliminated.
- The Transactions are expected to be approximately 10% to 20% accretive to both WES's and WGP's estimated distributable cash flow per unit each year from 2019 to 2021.
- Public WES unitholders will receive 1.525 WGP common units for each WES common unit in a tax-free exchange, which represents a 7.6% premium to WES's closing price on November 7, 2018.
- WES and WGP will become a single publicly-traded partnership, with a significantly larger public float and increased expected trading liquidity.
- The Acquisition is an immediately accretive transaction of high-growth, complementary assets in the Delaware and DJ Basins at ~9.5x 2019 forecasted Adjusted EBITDA of approximately $420 million, which includes $40 million of incremental general and administrative expenses to be assumed post-closing.
- The Acquisition will be financed 50% with cash and 50% with equity issued to APC.
- In 2019, WGP unitholders are expected to experience 6% - 8% distribution growth, while current WES unitholders are expected to experience 1% - 2% distribution growth.
- WGP expects to generate no less than 1.2x full-year distribution coverage in 2019 and distribution growth of 6% - 8% in 2020 and 2021 with coverage of over 1.3x.
- WES believes it will retain its current ratings and outlooks with all three major ratings agencies.
- Subject to WES unitholder approval, the Transactions are expected to close in the first quarter of 2019.

"The transactions we announced today will transform the Western Gas franchise, and put it on a new, stronger footing for continued success in the future. We have executed these transactions at a time when we are realizing strong organic cash flow growth and expanding distribution coverage," said Chief Executive Officer, Benjamin Fink. "This step serves to strengthen our already considerable competitive advantages via a lower cost of equity and

a clean, simple capital structure. We are delighted to have been able to structure a transaction in which we expect all unitholders will realize annual distribution growth in 2019, as well as an enhanced long-term distribution growth profile."

**Simplification Transaction Details**

Under the terms of the Agreement, the public unitholders of WES will receive 1.525 units of WGP per WES unit owned. This represents a 7.6% premium to WES's closing price on November 7, 2018. The WES common units currently owned by Anadarko, including the Class C units, will be converted into WGP common units at closing at the same exchange ratio. In addition, the WES IDRs and general partner units will be exchanged for newly issued WES common units.

The Simplification Transaction will not be taxable to either WES or WGP unitholders and is expected to close in the first quarter of 2019, subject to the approval of holders of a majority of the WES common units, regulatory approvals, and other customary closing conditions.

The WGP Special Committee, consisting of directors not associated with management or APC, evaluated the Transactions on behalf of the public unitholders and the WGP Board of Directors. The WGP Special Committee unanimously recommended approval of the Transactions to the Board of Directors of WGP. The WES Special Committee, consisting of directors not associated with management or APC, evaluated the Transactions on behalf of the WES Board of Directors and the public unitholders and also unanimously recommended approval of the Transactions to the WES Board of Directors. The Transactions were unanimously approved by the Board of Directors of each of WGP, WES and APC

**The Proxy Omits Material Information**

27. On January 28, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's unitholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's unitholders to make an informed voting decision in connection with the Proposed Transaction.

28. First, the Proxy fails to provide enough information regarding financial projections

for the Company.

29. In particular, the Proxy states that on October 16, 2018, "the Project Clarity Forecast Model, consisting of standalone forecasts for WES…were made available to the Special Committees and their respective advisors through the virtual data room." Proxy at 42 (citations omitted). Later, on October 24, 2018, "an updated Project Clarity Forecast Model was made available to the Special Committees and their respective advisors through the virtual data room." *Id.* However, the Proxy selectively only discloses one set of projections and, in addition, fails to disclose the "updates" that were made to the Project Clarity Forecast Model, despite the fact that the initial iteration of the projections were less than 2 weeks old.

30. Accordingly, it appears that Defendants selectively excised a recent and relevant set of projections that that WES Special Committee reviewed when considering the Company's strategic alternatives.

31. The failure to disclose the initial set of the Project Clarity Forecast Model (from October 16, 2018) and additional information clarifying the specific changes and adjustments that were made to the updated Project Clarity Forecast Model (from October 24, 2018) renders the *Unaudited Financial Projections* section of the Proxy and Lazard's financial analyses materially incomplete and misleading. If a proxy statement discloses financial projections and valuation information, such projections **must be complete and accurate**. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—**but it may not choose half-truths.** Thus, Defendants' omission renders the projections disclosed on pages 65 to 67 misleading.

32. With respect to Lazard's *Dividend Discount Model Analysis—WES*, the Proxy is materially misleading and incomplete because it fails to disclose: (i) the inputs and assumptions

8

underlying the selection of the range of discount rates from 9.0% to 11.0%; (ii) WES's calculated estimated terminal values; and (iii) the inputs and assumptions underlying the selection of the range of terminal multiples ranging from 8.25x to 10.25x. *See* Proxy at 54.

33. Similarly, with respect to Lazard's *Dividend Discount Model Analysis—WGP*, the Proxy is also materially misleading and incomplete because it fails to disclose: (i) the inputs and assumptions underlying the selection of the range of discount rates from 9.0% to 11.0%; (ii) WGP's calculated estimated terminal values; and (iii) the inputs and assumptions underlying the selection of the range of terminal multiples ranging from 10.00x to 12.00x. *See* Proxy at 57.

34. Likewise, with respect to Lazard's *Discounted Cash Flow Analysis—Dropdown Assets*, the Proxy is also materially misleading and incomplete because it fails to disclose: (i) the inputs and assumptions underlying the selection of the range of discount rates from 7.5% to 10.0%; (ii) the estimated terminal values for the Dropdown Assets; and (iii) the inputs and assumptions underlying the selection of the range of terminal multiples ranging from 8.50x to 10.25x. *See* Proxy at 58.

35. These key inputs are material to WES unitholders, and their omission renders the summaries of Lazard's *Dividend Discount Model Analysis—WES*, *Dividend Discount Model Analysis—WGP*, and *Discounted Cash Flow Analysis—Dropdown Asset* analyses incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted*

> *cash flow value by tens if not hundreds of millions of dollars….*This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* ***unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, WES unitholders cannot evaluate for themselves the reliability of Lazard's *Dividend Discount Model Analysis—WES*, *Dividend Discount Model Analysis—WGP*, and *Discounted Cash Flow Analysis—Dropdown Asset* analyses, make a meaningful determination of whether the implied price per share unit ranges reflect the true value of the Company or was the result of an unreasonable judgment by Lazard, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

36.     With respect to Lazard's *Selected Comparable Company Multiples Analysis—WES*, the Proxy fails to disclose the individual multiples Lazard calculated for each of the companies included in the analysis. *See* Proxy at 54-56. A fair summary of the *Selected Comparable Company Multiples Analysis—WES* requires the disclosure of the individual multiples for each company utilized; providing the low, high, median, and mean multiples that a banker calculated to render WES's price per unit range is insufficient, as unitholders are unable to assess whether the banker applied the appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied valuation of the Company. Furthermore, the analysis also fails to even disclose the multiples that were applied to calculate the "overall" resulting range of implied per unit equity values for WES common units was $36.25 to $46.25. *See* Proxy at 56. Accordingly, the omission of the individual multiples and the specific multiples used to calculate the "overall resulting range" renders

the summary of these analyses set forth on pages 54 through 56 of the Proxy materially incomplete and misleading.

37. Similarly, Lazard's *Selected Precedent Transactions Analysis—WES*, *Selected Comparable Company Multiples Analysis—WGP*, *Selected Comparable Company Multiples Analysis—Dropdown Assets*, and *Selected Precedent Transaction Analysis—Dropdown Assets* all fail to disclose the individual multiples for each transaction or company utilized, in addition to the multiples that were used to calculate the overall resulting range for each analysis.  *See* Proxy at 56-57, 57-58, 58-60, 60-62.  For the same reasons mentioned above, the failure to disclose the individual multiples and the specific multiples applied to calculate the "overall resulting range" renders the summary of each analysis materially incomplete and misleading.

38. Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading.

39. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming Unitholder Vote, Plaintiff will be unable to make an informed decision regarding whether to vote his units in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 )**

40. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

41. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission

may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

42. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

43. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

44. Defendants have issued the Proxy with the intention of soliciting the Company's common unitholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for WES; and (ii) the valuation analyses performed by Lazard in support of its fairness opinion.

45. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's unitholders although they could have done so without extraordinary effort.

46. The Individual Defendants knew or were negligent in not knowing that the Proxy is

materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Lazard reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Lazard, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Lazard's analyses in connection with their receipt of the fairness opinions, question Lazard as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

47. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

48. WES is also deemed negligent as a result of the Individual Defendants' negligence in

preparing and reviewing the Proxy.

49.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Unitholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

50.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.     The Individual Defendants acted as controlling persons of WES within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of WES, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

52.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

54. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

55. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

56. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

57. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Unitholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result

of their wrongdoing;

  C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

  D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 28, 2019  **MONTEVERDE & ASSOCIATES PC**

  By: */s/ Juan E. Monteverde*
  Juan E. Monteverde (JM-8169)
  The Empire State Building
  350 Fifth Avenue, Suite 4405
  New York, NY 10118
  Tel:(212) 971-1341
  Fax:(212) 202-7880
  Email: jmonteverde@monteverdelaw.com

  *Attorneys for Plaintiff*